NOT FOR PUBLICATION

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In the Matter of | : | Case No. 08-27733-JHW |
| Stratford Nursing and Convalescent Center | : | |
| Debtor | : | |

---

| | | |
|---|---|---|
| Israel Berkowitz, Leopold Berkowitz, Frady Zyskind, Ezra Berkowitz, Emmanuel Pollack, Chaim Teitelbaum and Yoshua Teitelbaum | : : | Adversary No. 09-1987 |
| | : | **OPINION** |
| Plaintiffs | : | |
| v. | : | |
| Stratford Nursing and Convalescent Center | : | |
| Defendant | : | |

---

APPEARANCES:     Edward G. Sponzilli, Esq.
Gary N. Marks, Esq.
Norris McLaughlin & Marcus PA
721 Route 202-206
P.O. Box 5933
Bridgewater, New Jersey 08807-5933
Counsel for the Plaintiffs

Melissa A. Pena, Esq.
Christopher G. Elko, Esq.
Norris, McLaughlin & Marcus
875 Third Avenue
New York, New York 10022
Counsel for the Plaintiffs

Albert A. Ciardi, III, Esq.
Jennifer E. Cranston, Esq.
Ciardi, Ciardi & Astin, P.C.
One Commerce Square
2005 Market Street, Suite 1930

**FILED**

JAMES J. WALDRON, CLERK

September 11, 2009

U.S. BANKRUPTCY COURT
CAMDEN, N.J.
BY: Theresa O'Brien, Judicial
Assistant to Chief Judge Wizmur

Philadelphia, Pennsylvania 19103
Counsel for the Debtor

Marvin Neiman, Esq.
Neiman & Mairanz, P.C.
39 Broadway, 25th Floor
New York, New York 10006
Counsel for the Estate of Joel and Hana Teitelbaum

D. Alexander Barnes, Esq.
Obermayer, Rebmann, Maxwell & Hippel
1617 JFK Boulevard, Suite 1900
Philadelphia, Pennsylvania 19103
Counsel for the Official Unsecured Creditors' Committee

The debtor herein, the Stratford Nursing and Convalescent Center, seeks to sell its New Jersey license to operate a nursing home, along with all of its regulatory rights to operate 104 beds, to the successful third party bidder at a court auction.  The debtor's landlord (the "Owner's Group") objects to the sale, contending that the "bed rights" to operate 104 nursing home beds are not property of the debtor's bankruptcy estate, the debtor has no independent ownership of the bed rights, and that therefore, the debtor cannot sell those rights.  To resolve the issues presented, we must examine the respective rights of the Owners Group and the debtor, and review the applicable statutory and regulatory changes governing nursing homes that have occurred over the last 40 years in the state of New Jersey.

## **FACTS**

The business relationship between the debtor and the Owners Group dates back to 1968.  It was around that time that Morris Berkowitz first learned that the owners of a licensed, operating nursing home in Stratford, New Jersey, operating as "Stratford Nursing", were seeking to sell their facility. Following a visit to the fully operational 100 bed facility, Mr. Berkowitz and a group of his friends, including Rabbi Joel Teitelbaum and his wife Hannah, Abraham Nieman, and others, collectively referred to hereinafter as the "Owners Group," decided to purchase the property from the previous owner, Geriatric Housing, Ltd.[1]

At Abraham Neiman's request, the Owners Group determined to allow Mr. Nieman's son, Louis Neiman, to operate the nursing home.  For that purpose, in December 1968, the Owners Group arranged for the incorporation of the "Stratford Nursing and Convalescent Center" (hereinafter "Stratford Nursing"), with Louis Neiman as the president of the corporation, holding 98% of the stock.[2]  One week after the incorporation, on December 17, 1968, Stratford

---

[1]     The plaintiffs herein are some of the successors and assigns of the Owners Group.

[2]     The original incorporators transferred their shares to the new officers on December 12, 1968.  Exh. LN-13.

Nursing applied for a nursing home license with the State of New Jersey,
Department of Institutions and Agencies.  Because Stratford Nursing did not
hold an actual ownership interest in the property, the Owners Group learned
that a lease between the Owners Group and Stratford Nursing would be
required for license approval.  A lease was entered into between members of the
Owners Group and Stratford Nursing dated January 1, 1969, and was
submitted to the state as part of the license application.  The application was
approved, and Stratford Nursing was given a license to operate the facility.

With these initial preparations in place, the Owners Group executed an
agreement, dated January 1, 1969, to purchase the nursing home located at the
intersection of Laurel and Warwick Roads, later designated as 18 West Laurel
Road, Stratford, New Jersey from Geriatric Housing, Ltd.  The closing occurred
on January 16, 1969.  The purchase covered the entire operating facility,
including the real estate, buildings, furniture, equipment, fixtures, and the
"Stratford" name, as a "turn-key" operation.  Geriatric's license to operate was
not purchased or transferred, but was replaced by the new operating license
obtained by Stratford Nursing.  The Owners Group assumed an FHA mortgage,
which required the mortgagor to use the building solely for the purpose of
operating a nursing home.

The lease executed between the Owners Group and Stratford Nursing was originally due to end on December 31, 1990, but was extended several times. Presently, the lease terminates on December 31, 2010.  In relevant part, the lessor leased "all those premises situate[d] in the Borough of Stratford, County of Camden, State of New Jersey consisting of a 100-bed nursing home . . . together with the buildings, furniture, equipment and fixtures contained therein."  Lease Agreement, ¶ 1.  The lease required that the property "be used and occupied solely for a nursing and convalescent home."  Id. at ¶ 3.  The agreement provided for an initial rental payment of $110,000 a year plus all taxes, sewer and water charges and utilities.  Id. at ¶ 5.  On December 31, 1969, the parties amended their agreement to reflect that future rental charges would be tied to the number of beds in the facility.  The lessee agreed further, at its own expense, to "promptly comply with . . . the requirements of any applicable statute, law, ordinance, regulation or order now or hereinafter made with respect to . . . the use or occupancy of the demised premises."  Id. at ¶ 7. The lease made no mention of the right to apply for a license to operate the nursing home, and made no mention of "bed rights."

Following the purchase of the nursing home in 1969, Stratford Nursing applied for and successfully renewed its operating license every year.  The application to renew the license, as submitted by the debtor in 2009, lists the

"Owner/Corporation Name (Licensed operator)" as "Stratford Nursing and Convalescent Ctr".  Under "Building Identification", the category marked "Leased" is checked, with the "Owner of physical asset" designated as Joel Teitelbaum, a member of the Owners Group.  Debtor's Pre-Trial Brief, Exh. "B". The debtor has paid all renewal fees, taxes, and all other operating expenses of the nursing home since it took over the operations in January 1969.

## PROCEDURAL HISTORY

On September 17, 2008, the debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

On January 22, 2009, the debtor moved for an extension of the time to assume or reject its lease with the landlord for the Stratford facility.  An order was entered extending the time to March 25, 2009.  A motion to assume the lease was filed on March 23, 2009, adjourned several times and carried pending the outcome of this proceeding.

On April 24, 2009, the debtor amended Schedule B of its petition to include the operating license it holds with respect to the nursing home.  Then, on May 8, 2009, the debtor filed a motion pursuant to section 363(b) to sell the

license and its associated regulatory rights to operate 104 beds.  The motion to

sell specifically excluded all accounts receivable, all cash equivalents, and all

inventory and contracts.  The sale proposed to transfer the license to a new

location, to close the current nursing home, to relocate all of the residents and

to dismiss all of the current employees.  The debtor identified the prospective

buyer as 18 West Laurel Road, LLC with an offer to purchase the license for

$700,000.  The proposed sale included a two year Consulting Agreement

between the buyer and Louis Neiman, the debtor's president.  The Creditors'

Committee objected to the terms and to the bidding procedures.  On June 8,

2009, a hearing was held and another entity, Stratford Home & Health 2009,

LLC, was approved as the stalking horse bidder.  An order approving the

bidding procedures and reserving the rights of all parties to contest the debtor's

ability to sell the license was entered on June 19, 2009.  Order at ¶ 10.


On June 26, 2009, the Teitelbaum Estate filed a timely objection to the

sale, claiming that the debtor had "no independent ownership of the operating

license and its concomitant rights" and that "[w]hatever rights to operate the

nursing home and make use of the existing license in the beds that the Debtor

has, were obtained from the Landlord by way of the grant of the lease."  Obj. to

Sale at 3, ¶¶ 13, 14.  The Estate contended that "the operating license which is

being used by the tenant is not separate from the leasehold interest in the real

property and cannot be sold by the Debtor, since they are not owned by the

Debtor." <u>Id</u>. at ¶ 17.


Plaintiffs, who are the successors and assigns of the Owners Group,

commenced this adversary proceeding on July 1, 2009 seeking:  (1) a

declaratory judgment regarding the ownership of the license and Certificate of

Need for the nursing home; (2) whether the bed rights constituted property of

the debtor's estate, and (3) temporary restraints and permanent injunctive relief

against the debtor to prevent the sale of the bed rights, the closure of the

nursing home, the relocation of the residents and the dismissal of the nursing

home's employees.  At the hearing, on July 1, 2009, it was determined that the

planned auction of the debtor's license and bed rights would go forward in

court, but that the landlord's objection to the sale would be preserved and

resolved at a subsequent date.  An auction was held in court, at which time the

court determined that Stratford Home & Health 2009, LLC made the highest

and best offer at $1,250,000.  18 West Laurel Road, LLC, was named the

alternate purchaser at $1,225,000.  A trial date was set for August 5, 2009 to

resolve the objections and the adversary proceeding regarding the ownership of

the license and "bed rights".  The order provided that if it was determined that

the bed rights lie with the debtor, the sale would proceed as approved.  If it was

determined that the bed rights reside with the landlord and the plaintiffs, the

sale would be ruled null and void.  An order to that effect was entered on July

23, 2009.

A plenary hearing on the issues was held on August 5 and August 6,

2009.  Thereafter, the parties attempted without success to resolve the dispute

through mediation.

## **DISCUSSION**

The parties dispute who owns the operating license, the Certificate of

Need and the "bed rights" of the nursing home.  The plaintiffs contend that the

lease agreement authorizes the debtor to operate the nursing home only during

the lease term.  When the lease terminates, the debtor's opportunity to operate

the nursing home terminates as well, reverting back to the landlord as the same

turn-key operation that was leased to the debtor.  The plaintiffs assert that the

debtor has no independent right to sell the bed rights of the nursing home, and

that the intervening changes in the state law and associated regulations did not

create new ownership rights in favor of the debtor.

The debtor contends that "[s]ince the Certificate of Need law was enacted

in New Jersey, the actual[] Certificate of Need and License which are the subject

of this litigation were at all points in time held in the name of the Debtor."

Debtor's Pretrial Brief at 6-7.  The debtor maintains that the license runs

separate and apart from the real property and physical assets of the nursing

home and that the license grants to the debtor the right to operate a "Long Term

Care Facility" consisting of "104 Long Term Care Beds."  The debtor points to

the actual license, executed in its name, as evidence that it is the license holder.

The debtor contends that a search of the State of New Jersey Department of

Health and Senior Services Division of Health Facilities Evaluation and

Licensing's website lists the debtor as the "Licensed Owner".  The debtor also

cites to the state regulations which provide for a Relocation Fee as confirmation

that a license can be transferred from one facility to another.  See N.J.A.C. 8:39-

2.2(b).  As the license holder and the holder of the Certificate of Need, the debtor

asserts that it controls the "bed rights" and it has the ability to sell them for the

benefit of the bankruptcy estate.  The debtor contends that the sale is in the

best interests of the residents of the nursing home and the creditors of the

debtor's bankruptcy estate.


Significant statutory and regulatory amendments concerning the

operation of nursing homes have been enacted over the last 40 years in the

State of New Jersey.  As a prelude to the review of these amendments, I note

that the term "bed rights" as used by both parties is undefined in the lease

-10-

agreement and cannot be found in the statutory and regulatory provisions.[3]
From the testimony presented to this court, the term "bed rights" may be
described as the beds associated with a particular facility that were either in
use and approved by the state prior to the advent of the Certificate of Need
program, and therefore, "grandfathered in," or as beds associated with a facility
that had gained approval under the Certificate of Need requirements.


      A.    <u>Statutory and Regulatory Framework</u>.


      At the time of the sale of the nursing home, around 1968-1969, the
regulation of nursing homes in New Jersey was governed by N.J.S.A. 30:11-1 <u>et</u>
<u>seq</u>.  <u>See</u> <u>Paul Kimball Hospital, Inc. v. Brick Tp. Hospital, Inc.</u>, 86 N.J. 429,
437, 432 A.2d 36, 39 (1981).  The law at that time expressly provided that no
private nursing home, defined as "any institution, whether operated for profit or
not, which is not maintained, supervised or controlled by an agency of the
government of the State or of any county or municipality and which maintains
and operates facilities for the . . . care of 2 or more nonrelated individuals,"
N.J.S.A. 30:11-8, could "operate within this State except upon license first had

---

     [3]     Louis Neiman stated in his deposition: "Yes, I know the term
nursing home beds.  I know the term licensed bed.  I don't know what the term
bed rights is. Doesn't exist in the nomenclature nor in the statutes."  L.Neiman
Dep. T128-23 to T129-1 (7/28/09).

and obtained for that purpose from the [Department of Institutions and

Agencies], upon application made." N.J.S.A. 30:11-1. See Holly v. Bates, 7 N.J.

191, 197, 81 A.2d 151, 154 (1951). The statute further directed that to obtain a

license, the applicant had to complete:

> forms furnished by the department, shall set forth the location of
> the home or hospital, the person in charge thereof, and the facilities
> for caring for persons who may seek treatment therein. The
> applicant shall be required to furnish evidence of its ability to
> comply with minimum standards of medical and nursing care,
> financial ability to successfully operate the institution for which the
> license is sought, and of the good moral character of the person in
> charge thereof.

Id. Additional license application requirements were added in 1964, including,

among other things, that the "license shall not be transferable or assignable

except with the written approval of the department." N.J.S.A. 30:11-1.4.

At the time of the sale of the nursing home from Geriatric Housing to the

Owners Group in 1969, the operating license held by Geriatric was not

transferred or assigned to the Owners Group. N.J.S.A. 30:11-1.4. Mr.

Berkowitz testified that the license was not a factor in the purchase. The

Owners Group understood that under New Jersey law at the time, to operate

the nursing home after the sale, the Owners Group or its designee would have

to apply for a new license. In fact, the parties did just that. A corporate entity,

Stratford Nursing, was formed with Louis Neiman as the president. Stratford

-12-

Nursing was given a lease by the Owners Group to operate the facility and Louis

Neiman applied for and was granted a license in the name of Stratford Nursing

to operate the nursing home.

On May 10, 1971, the New Jersey Legislature enacted the Health Care

Facilities Planning Act, N.J.S.A. 26:2H-1 et seq. to "'promote the financial

solvency of hospitals and similar health care facilities' and contain the spiraling

cost of inpatient and outpatient medical care.'" Radiological Soc. of New Jersey

v. New Jersey State Dept. of Health, Hosp. Rate Setting Com'n, 208 N.J. Super.

548, 551, 506 A.2d 755, 756 (App. Div. 1986).  Prior to the passage of that

legislation, except for licensing requirements such as competency, financial

capability and good moral character, the opportunity to open new nursing

homes and to expand existing facilities was unrestricted by the state.  "The

Health Care Facilities Planning Act radically altered the extent of regulation and

control over health care facilities and services.  Among other things the Act

required procurement of a certificate of need for construction or expansion of a

health care facility or for institution of new health care services."[4]  Paul Kimball

Hospital, Inc. v. Brick Tp. Hospital, Inc., 86 N.J. 429, 437, 432 A.2d 36, 39

---

[4]        The Act provided that "[n]o health care facility shall be constructed
or expanded, and no new health care service shall be instituted after the
effective date of [the Act] except upon application for and receipt of a certificate
of need as provided by [the Act]."  N.J.S.A. 26:2H-7.

(1981).  "No agency of the State or of any county or municipal government [was

permitted to] approve any grant of funds for, or issue any license to, a health

care facility which is constructed or expanded, or which institutes a new health

care service, in violation of the provisions of [the Act]."  N.J.S.A. 26:2H-7.


The passage of the new legislation only impacted new facilities and

facilities seeking to expand.  Existing nursing homes, including Stratford

Nursing, were "grandfathered" in, meaning that they were not required to obtain

a Certificate of Need ("CON").[5]  Robert Fogg, Esquire, testifying as an expert on

New Jersey regulatory matters pertaining to nursing homes, noted that:

> the existing healthcare facilities in operation at the time really
> received, did not receive a Certification of Need.  They received
> nothing of the sort, no[t] even notice that they were exempt from a
> CON, because it was just assumed that they were in operation, they
> were exempt at the time.

T113-4 to 8 (8/5/09).  See also Paul Kimball Hospital, Inc. v. Brick Tp. Hospital,

Inc., 86 N.J. at 440, 432 A.2d at 41 (Existing hospitals were grandfathered in by

the Health Care Facilities Planning Act and did not need to obtain a certificate

of need.).[6]

---

[5]      Mr. Fogg testified:  "if you were an operating nursing home at the
time the act was implemented in 1974, there was no requirement for you to
obtain a CON."  T112-23 to 25 (8/5/09).

[6]      In 1974, Congress enacted the National Health Planning and
Resources Development Act ("NHPRDA"), Pub. L. No. 93-641, 88 Stat. 2225

The regulatory scheme promulgated to manage the issuance of CON's

provides that to obtain a Certificate of Need, the applicant must be the owner or

lessee of the property where the facility is located.  N.J.A.C. 8:33-4.4.  A

Certificate of Need will generally not be granted unless it

> is necessary to provide required health care in the area(s) to be
> served, can be financially accomplished and maintained, licensed in
> accordance with applicable licensure regulations, will not have an
> adverse economic or financial impact on the delivery of or access to
> health care services in the region or Statewide, and will contribute
> to the orderly development of adequate and effective health care
> services.

N.J.A.C. 8:33-1.2(c).  The area to be served is generally defined as the county

where the facility is located and any contiguous counties.  N.J.A.C. 8.33-1.3.

The transfer of ownership of a long-term care facility does not require a

new certificate of need, N.J.A.C. 8:33-3.3, unless it also involves an increase in

---

(1975), to require and fund the establishment of state and regional health
planning and development agencies.  As a prerequisite to receive federal
funding, the states were required to enact and administer Certificate of Need
statutes.  See 42 U.S.C. §§ 300m(d)(2)(D) (1975).  Through the Certificate of
Need mechanism, these agencies were directed to regulate the purchase of
major medical equipment, the supply of hospital beds, and control the
expansion of health care facilities and programs. 42 U.S.C. § 300n(6)(B)(ii)(II).
Other New Jersey statutory amendments which do not alter the analysis here
followed, including the Health Care Cost Reduction Act, enacted in 1991, which
provided that "[t]he State Health Plan shall identify the unmet health care
needs in an area by service and location and it shall serve as the basis upon
which all certificate of need applications shall be approved."  In re the Adoption
of Regulations Governing the State Health Plan, N.J.A.C. 8:100, et seq., 262
N.J. Super. 469, 474, 621 A.2d 484, 486 (App. Div. 1993).

the number of licensed beds.  N.J.A.C. 8:33-3.4(a)(1).  The relocation of licensed

beds from one facility to another, within the same planning region, which would

increase the number of beds in the new location, would require a new certificate

of need.  N.J.A.C. 8:33-3.4(a)(3).  The transfer of licensed beds outside of the

same planning region is prohibited.  N.J.A.C. 8:33-3.4(a)(4).  In order to transfer

an entire licensed facility from one location to another, within the same

planning region, a new certificate would be needed unless the original facility

ceases operations once the new facility is licensed.  N.J.A.C. 8:33-3.5(a)(4).

        The holder of an approved Certificate of Need for a specified number of

beds must apply for a license before they are authorized to operate a facility.

N.J.A.C. 8:33H-1.20 ("Applicants receiving certificate of need approval under the

provisions of this chapter shall comply with all applicable licensing

requirements of N.J.A.C. 8:39 [Long-term Care] and 8:36 [Assisted Living].");

N.J.A.C. 8:39-2.1 ("a health care facility shall not be . . . licensed to operate

except upon application for and receipt of a certificate of need").  The license is

issued to the operator of the facility, N.J.A.C. 8:39-2.4(a), and the facility cannot

accept more residents than it has been approved or licensed to accept.  N.J.A.C.

8:39-2.4(c).  The facility may seek, by application to the Department, to increase

its total number of licensed beds by ten (10) beds or 10%, whichever is less,

without obtaining a new certificate of need.  N.J.A.C. 8:39-2.11.  Requests are

-16-

limited to once every five (5) years.  Id.

As noted above, ownership of the long-term care facility can be transferred without obtaining a new certificate of need.  See N.J.A.C. 8:39-2.12. However, the license shall "not be assignable or transferable and shall be immediately void if the facility ceases to operate or if its ownership changes." N.J.A.C. 8:39-2.4(g).  Mr. Fogg confirmed in his testimony that:  "[a] license for a nursing home or any other healthcare provider is not transferrable by regulation and by statute.  It's – a license is held by the current operator, . . . of the healthcare facility." T96-13 to 16 (8/5/09).  "[W]hile licenses are not transferrable, the rights to apply for that license are transferrable."  Id. at T97-20 to 21.  The prospective new owner must seek to be licensed in the normal course.  N.J.A.C. 8:39-2.12(b).

B.     Impact of CON's on Stratford Nursing.

The legislation creating the Certificate of Need ("CON") requirement and the regulations enacted to implement CON's had no immediate impact on existing facilities such as Stratford Nursing.  The new requirements did not change the respective ownership interests held by lessees or owners.  A CON was required only if the facility sought to expand, to relocate or to close down.

The long-term impact of the CON requirements was the curtailment and ultimate cessation by the state of approval for new healthcare facilities, including nursing homes.  No additional nursing home beds have been approved by the state in over 20 years, except for the nominal increase in the number of beds in existing facilities authorized statutorily.  Because the number of patient beds is now capped and restricted, the value of each patient bed has soared.  Prior to the creation of CON's, the value of so-called bed rights was nominal, because a new facility with additional beds could be built in the same vicinity without restriction.  After the creation of CON's, new facilities could no longer be built.  The bed rights of each facility came to be in demand, causing the advent of a market for, and a corresponding increase in, the value of bed rights.

The debtor seeks to tap the value of the 104 beds it has been licensed to operate for over 40 years for the benefit of the bankruptcy estate and its creditors.  According to the debtor, because the debtor was the only entity licensed from the outset of the purchase of the nursing home by the Owners Group to operate the nursing home, and because the CON procedure was enacted during the debtor's licensure, the debtor gained the benefit of the bed rights of the nursing home and the increased value emanating from these rights.  In the words of debtor's counsel in closing remarks, during the period of

-18-

debtor's licensure, the "rights landed in the debtor's lap."

The description of the CON procedure cited above does not support the debtor's position.  The certificate of need process pertained only to new facilities and transfers of ownership.  Neither the status of the debtor nor the relationship between the debtor and the landlord were altered by the introduction of the cap on the number of patient beds allowed to be operated in each region throughout the state.  The fact that the value of existing beds was enhanced by the advent of the process did not alter the property rights of the parties.

C.    Ownership of the Right to Operate 104 Beds.

To support its contention that the debtor owns the opportunity to operate 104 nursing home beds, and may sell those rights, the debtor highlights that the lease between the parties is silent on the ownership of a license to operate the premises and makes no mention of the landlord's reversionary interest in such a license.  Therefore, the license, which has been owned by the debtor from its inception in 1968, enables the debtor to sell that license, along with the right to operate the 104 beds that the license authorizes.  The debtor's arguments must fail.

-19-

It is undisputed by the parties that the Owners Group purchased the nursing home as a fully operational facility.  The Owners Group had the option to obtain a license itself to operate the nursing home, to sell the right to operate the nursing home or to lease that right to a tenant.  Notwithstanding the fact that the lease entered into between the Owners Group and the debtor does not mention the term "license", both the surrounding circumstances of the purchase of the nursing home and the actual terms of the lease confirm that the Owners Group leased not only the physical plant, equipment, supplies, etc., but also conveyed, during the term of the lease, the opportunity to obtain the necessary license from the State of New Jersey to operate the facility.  Most significantly, the debtor did not purchase anything from the landlord.  The agreement between the parties contemplated the operation of the nursing home by the debtor during the term of the lease.  No ownership interest was conveyed.  The FHA mortgage assumed by the Owners Group at the time of purchase required the continued use of the facility as a nursing home.  The Lease Agreement provided for the lease of a "100 bed nursing home" to be "used and occupied solely for a nursing and convalescent home".  Lease Agreement, ¶¶ 1, 3.  Under paragraph 6, the debtor was charged with keeping the premises and equipment in good condition, with all replacements of fixtures, equipment and furniture to become property of the lessor.  In paragraph 7, the debtor was charged with complying with all applicable statutes and regulations with

-20-

respect to the use or occupancy of the demised premises.  See also ¶ 14(B)

(requiring the debtor to comply with all state and federal statues and

regulations "applicable to lessee or its use of the demised premises").  In the

event of the debtor's default, the agreement provided that the landlord would

have the right to reenter the premises and to "again, repossess and enjoy,

together with the furnishings and equipment . . . with any replacements

thereof."  Id. at ¶ 17.  Finally, in paragraph 29 of the agreement, provision was

made for the resolution of disputes between the parties by arbitration.  "Each

party shall select one arbitrator and the two so selected shall select a third, who

shall be a person experienced in the business and operation of a nursing home."

Id. at ¶ 29.


     The only plausible interpretation of the Lease Agreement between the

landlord and the debtor is that the debtor agreed to operate the nursing home

owned by the Owners Group, leased the entire turn-key operation to do so,

agreed to comply with all federal and state requirements to operate, including

obtaining a license to operate from the state, and would return possession of

the nursing home, including the opportunity of the facility to continue to

function as such, to the Owners Group at the termination of the lease.


     Mr. Fogg, the plaintiff's expert witness, and Mr. Berkowitz, the

representative of the Owners Group, testified convincingly that in 1968, when

the lease agreement was entered into, it was not common practice to address

the issues of licenses and bed rights in lease arrangements of the type we are

reviewing here.  The parties understood that an operating license would be

necessary, and that the entity that would operate the facility would have to

apply for that license.  Because the number of beds in any particular geographic

location was not restricted, there was nominal value in the existence of a

particular number of operating beds in a particular facility.  The only conclusion

that can be drawn from these circumstances and from the terms of the lease is

that the opportunity to apply for a license to operate the fully functional and

operational nursing home was an integral part of the lease, and that the

opportunity to be licensed to operate the existing nursing home beds was not

conveyed to the tenant, but was simply leased to it.


The debtor is correct to reflect that the license issued by the state of New

Jersey belongs to the debtor.  However, the regulatory framework makes clear

that CON's and licenses are two different things.  CON's are transferable if no

additional beds are added.  A license to operate is not transferable, but the right

to apply for a license is transferable.  An application for an operating license

must be accompanied by a right to operate the specified number of beds.  A

license cannot be transferred without transactional documents demonstrating

-22-

the right of the prospective licensee to operate the facilities.

Neither the application form, naming the debtor as the "Owner/
Corporation name (Licensed operator)," nor the State of New Jersey Department
of Health and Senior Services website designating the debtor as the "Licensed
Owner" of the facility, furthers the debtor's quest to establish ownership of the
license.  Mr. Fogg testified credibly that the state agency issuing licenses looks
for some showing that the prospective licensee has the right to operate the
facility, either through ownership or lease.  If a contest is presented regarding a
prospective licensee's authority to apply for the license, the agency will not
resolve that dispute.  The issue is not a regulatory issue, but a matter of
property law.  The debtor has no cognizable property right in Stratford Nursing
except the right to operate the facility during the term of the lease.

The debtor also contends that reliance was placed by vendors, patients
and other creditors on its status as the owner of the license for the nursing
home, and that an "undisclosed alleged silent ownership of the license" cannot
be sustained under the circumstances.  The debtor's argument in this regard
must also be rejected.  When the debtor entered into the Lease Agreement, it
undertook responsibility for all operational matters involving the nursing home,
including the annual renewal of the license, payment of all tax obligations, and

payment of all other expenses.  Creditors could properly look to the debtor as the licensee responsible for the payment of all operational costs.  However, that reliance does not translate to offer to the debtor an ownership interest in the bed rights associated with the nursing home, or the continued authority to apply for a license to operate those beds following the expiration of the lease term.  The matter of the ownership of the real estate is a matter of public record, not only by the recording of the deed, but also by the reflection on the license application.  There is no other disclosure requirement or misrepresentation that is presented in this record that would cause the ownership of the bed rights to be transferred to the debtor.

Fundamentally, the debtor's argument fails because there is a difference between ownership of a license and ownership of the bed rights that must accompany the application for a license, i.e., the right to operate particular beds that have been approved, either before or since the advent of the CON program. The debtor owns the license, but the Owners Group owns the right to operate the beds.  The Owners Group ownership interest in the operational nursing home facility was not purchased by the debtor, and reverts back to the Owners Group at the end of the lease between the parties.  Because the debtor cannot sell property that is not property of the estate, the plaintiffs are entitled to declaratory judgment sustaining their objection to the proposed sale, and

declaring their ownership of the bed rights of the nursing home.


Plaintiff shall submit a form of order in conformance with this ruling.



Dated: September 11, 2009

_____
JUDITH H. WIZMUR
CHIEF JUDGE
U.S. BANKRUPTCY COURT